UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| MATTHEW TERRELL, | Case No.: 17cv0088 BTM (AGS) |
|---|---|
| Petitioner, | **ORDER: (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS; and (2) DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| C. ARMANT, | |
| Respondent. | |

## I. <u>INTRODUCTION</u>

Petitioner Matthew Terrell, state prisoner, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his conviction in San Diego Superior Court case no. SCN320008 for assault with intent to commit rape or oral copulation and false imprisonment. (Pet., ECF No. 1 at 2.)[1] Terrell contends the evidence was insufficient to convict him of assault with intent to commit rape or oral copulation. (*Id.*)

The Court has read and considered the Petition, the Memorandum of Points and Authorities in Support of the Petition ("Petition" or "Pet."), the Answer and Memorandum of Points and Authorities in Support of the Answer ("Answer") [ECF No.

---

[1] Page numbers for docketed materials cited in this Order refer to those imprinted by the Court's electronic case filing system, except for lodgments.

1

5], the Traverse and Memorandum of Points and Authorities in Support of the Traverse [ECF Nos. 7-8], the lodgments, and the legal arguments presented by both parties. For the reasons discussed below, the Court **DENIES** the Petition and **DENIES** a certificate of appealability.

## II.     FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recounted the facts as follows:

> In June 2013, Terrell contacted the 20-year-old victim, Emily M. (Emily), via a Web site. Terrell offered Emily the opportunity to earn $50 an hour and get free athletic wear in exchange for reviewing and modeling athletic wear, and agreeing to be photographed in the clothes. Emily agreed. Terrell told Emily that the photo shoot would take place at the beach the following day, and that she should meet him at his motel room near the beach in order to change into the clothes.
>
> Emily arrived at Terrell's motel room the following day, selected a pair of running shorts that Terrell had placed on the bed, and went into the bathroom to change. When she came out, Terrell asked her if she would like to pose in her sports bra or keep her shirt on. Emily chose to keep her shirt on. Terrell instructed Emily to assume various poses, including a backbend and a handstand, while he took photographs of her. Terrell then asked Emily to assume a pose with her hands behind her back. Emily attempted the pose, but Terrell told her that she was not doing it quite right. After obtaining Emily's permission to touch her, Terrell began to reposition her arms behind her back. While doing so, Terrell placed zip ties around Emily's wrists, explaining that this would help her hold the pose.
>
> Shortly after placing the zip ties around her wrists, Terrell grabbed Emily's shoulders, dragged her toward the bed, and shoved her down on the the bed. Emily was "flailing and struggling," while lying on her back with her wrists zip tied underneath her body. Terrell climbed on top of Emily, holding her shoulders down and pinning her to the bed. A brief struggle

ensued, during which Emily bit Terrell's neck. Terrell eased up momentarily, allowing Emily to slip out from beneath him and off the bed. Emily began screaming loudly.

Terrell pushed Emily back against the bed. She continued to loudly scream, "Help!, help!" Terrell attempted to place his hand over Emily mouth while she was screaming, but she bit his hand. Emily was able to free herself from the zip tie and get to her feet. Terrell told Emily that he would let her go, but blocked the door to the room, preventing her from immediately leaving. Moments later, Terrell moved away from the door and Emily was able to flee the room.

Two other male guests had heard Emily screaming. One of the men called 911 and the other walked toward the room from which the men heard the screaming.

Police arrived and detained Terrell. A search of the room revealed the zip tie that Terrell had used to restrain Emily, as well as two bags of similar zip ties in a cubicle below the television. Police also found nine pairs of women's athletic shorts on the night stand. Six of the shorts did not have "panty liners." [FN 2] With respect to at least one of the pairs of shorts, it

> [FN 2: During questioning, the prosecutor described the panty liner as "a brief/liner in women's running shorts."]

appeared the panty liner had been "cut out or removed." In addition, police found a "ball gag" under the bed. [FN 3] In a backpack, police found

> [FN 3: An officer testified that the ball gag was comprised of a zip tie wrapped in duct tape. The officer described the nature of the ball gag as follows: "The way it's fashioned here, it looks like it's kind of bigger at one end, which would probably be strapped deep in the mouth so the person cannot create any type of noise or emit any type of screams or something like that."]

additional zip ties, duct tape, a belt with a buckle, a pair of scissors, a crescent wrench, several clothes pins, part of an electrical cord, and a panty liner from women's athletic shorts. Police also recovered a camera that contained photographs of Emily, wearing athletic shorts, striking various poses.

///

> Police also searched Terrell's bedroom and found additional zip ties, part of an electrical cord that appeared to match a portion of an electrical cord found in Terrell's backpack, and five panty liners that appeared to have been cut out from shorts or pants.

(Lodgment No. 6 at 2-4.)

## III.  PROCEDURAL BACKGROUND

On July 12, 2013, the San Diego District Attorney's Office filed a complaint charging Matthew Nathan Terrell with one count of assault with intent to commit rape or oral copulation, a violation of California Penal Code § 220(a)(1), and false imprisonment, a violation of California Penal Code §§ 236 and 237(a). (Lodgment No. 1 at 0001-03.) Following a jury trial, Terrell was convicted of both counts in the complaint. (*Id.* at 0093-94.) Terrell was sentenced to six years in prison. (*Id.* at 0226-27.)

Terrell appealed his conviction to the California Court of Appeal. (Lodgment No. 3.) The state appellate court upheld Terrell's conviction in a written, unpublished opinion. (Lodgment No. 6.) Terrell filed a petition for rehearing, which was denied. (Lodgment Nos. 7-8.) Following that denial, Terrell filed a petition for review in the California Supreme Court. (Lodgment No. 9.) The state supreme court summarily denied the petition for review. (Lodgment No. 10.)

On January 17, 2017, Terrell filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 and a Memorandum of Points and Authorities in Support of the Petition. (ECF No. 1.) Respondent filed an Answer, a Memorandum of Points and Authorities in Support of the Answer, and a Notice of Lodgment on June 12, 2017 (ECF Nos. 5-6); Terrell filed a Traverse on July 17, 2017, and a Memorandum of Points and Authorities in Support of the Traverse on September 13, 2017. (ECF Nos. 7-8.)

## IV.  DISCUSSION

Terrell contends there was insufficient evidence presented at trial to support his conviction for assault with intent to commit rape or oral copulation because there was no evidence of any sexual acts or intent, and the conviction is therefore based on speculation. (Pet., ECF No. 1 at 6.) Respondent contends the state court's resolution of

Terrell's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Answer, ECF No. 5 at 3-7.)

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d),

means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis – Sufficiency of Evidence*

Terrell argues the evidence was insufficient to establish that he harbored an intent to rape or orally copulate the victim, Emily, when he assaulted her. (Pet., ECF No. 1 at 6; attach. #1 at 13-23.) Terrell raised this claim in the petition for review he filed in the California Supreme Court. (Lodgment No. 9.) Because that court summarily denied the petition, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. After correctly identifying the governing federal and state authority, the court analyzed the claim as follows:

> The people presented evidence that Terrell concocted an elaborate ruse in order the lure the victim to a motel room. Once the victim was in the room, Terrell instructed her to model revealing clothing. After the victim had donned the clothing, Terrell instructed her to assume poses that the jury could have reasonably found were sexually suggestive and began taking

photographs of her. Then, using another ruse, Terrell bound the victim's wrists in zip ties, before forcibly throwing her on the bed and climbing on top of her. Terrell pinned the victim to the bed by holding her shoulders down. He relented only when the victim bit him on the neck and engaged in a physical struggle during which she was able to slide out from under him. While the victim was screaming, Terrell placed his hand over her mouth in an attempt to silence her. Prior to luring the victim to the motel room, Terrell hid items in the room that could be used to facilitate sexual conduct, including a ball gag and clothes pins. [FN 4] In addition, the People

> [FN 4: The jury was presented with testimony that ball gags are commonly used by clients of prostitutes to engage in sexual fantasies. The prosecutor argued that the clothes pins could be used as "nipple clamps" or "genital clamps."]

presented evidence that Terrell had cut the panty liners out of several of the shorts that he brought to the room for the victim to model. A jury could reasonably infer that Terrell cut the panty liners from the shorts in order to facilitate his access to the victim's genitals. In light of all of the evidence mentioned above, a reasonable jury could find that, at the time Terrell assaulted the victim, he harbored intent to rape or orally copulate her.

Terrell's arguments to the contrary are not persuasive. Terrell notes that "[h]e did not tell [the victim] he wanted to have sexual intercourse." While there is no evidence that Terrell stated his intentions, "intent is rarely susceptible of direct proof . . . ." (*Pre*, *supra*, 117 Cal.App.4th at p. 420.) Terrell also argues that he did not "touch [the victim] sexually." Even assuming that this is true, [FN5] the jury could reasonably infer from the

> [FN 5: The People contend that the jury could reasonably find that Terrell touched the victim in a sexual way, when he threw her down on the bed and climbed on top of her]

evidence discussed above that Terrell intended to sexually assault the victim, and that he was prevented from doing so only by her fierce resistance.

(Lodgment No. 6 at 5-7.)

In assessing a sufficiency of the evidence claim on federal habeas review, the Supreme Court has stated that "the relevant question is whether, after viewing the

7

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005). In determining whether sufficient evidence has been presented, the Court must accept the elements of the crime as defined by state law. *See Jackson*, 443 U.S. at 324, n. 16.

Under California Penal Code § 220, a person is guilty of the crime of assault with intent to commit rape/oral copulation by force if he or she "assaults another with intent to commit . . . rape [or] oral copulation . . . ." Cal. Penal Code § 220. "An assault is an unlawful attempt, coupled with a present ability, to inflict a violent injury on a person (§ 240) . . . . The only additional element of assault with intent to commit rape [or oral copulation] is the perpetrator's subjective intent, during the commission of the assault, to commit a rape [or oral copulation]." *People v. Cook*, 8 Cal. App. 5th 309, 313 (2017) (citations omitted). The jury was instructed as follows with regard to the crime of assault with intent to commit rape:

> To prove that the defendant is guilty of [assault with intent to commit rape] the People must prove that:
>
> 1. The defendant did an act that by its nature would directly and probably result in the application of force to a person;
>
> 2. The defendant did that act willfully;
>
> 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;
>
> 4. When the defendant acted, he had the present ability to apply force to a person;
>
> AND
>
> 5. When the defendant acted, he intended to commit a rape and/or oral copulation by force.

> Someone commits an act *willfully* when he or she does it willingly or on purpose.
>
> The terms *application of force* and *apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.
>
> The People are not required to prove that the defendant actually touched someone.
>
> No one needs to actually have been injured by the defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault.
>
> To decide whether the defendant intended to commit rape or forcible oral copulation, please refer to the instructions which define those crimes.

(Lodgment No. 1, vol. 1 at 0044-45.)

Rape is defined as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." Cal. Penal Code § 261. Forcible oral copulation is "the act of copulating the mouth of one person with the sexual organ or anus of another person" which is "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." Cal. Penal Code § 288a(a), (c)(2)(A). The jury was instructed on the crimes of rape by force, fear or threats and forcible oral copulation as follows:

> To prove the defendant is guilty of [rape by force, fear, or threats], the People must prove that:
>
> 1. The defendant had sexual intercourse with a woman;
>
> 2. He and the woman were not married to each other at the time of the intercourse;

9

3. The woman did not consent to the intercourse;

AND

4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.

*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required.

Intercourse is *accomplished by force* if a person uses enough physical force to overcome the woman's will.

*Duress* means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to the defendant.

Intercourse is *accomplished by fear* if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it.

. . . .

To prove that the defendant is guilty of [oral copulation by force, fear, or threats], the People must prove that:

1. The defendant committed an act of oral copulation with someone else;

2. The other person did not consent to the act;

AND

3. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to someone.

*Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is

not required.

///

> An act is *accomplished by force* if a person uses enough physical force to overcome the other person's will.
>
> *Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.
>
> An act is *accomplished by fear* if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it.

(Lodgment No. 1, vol. 1 at 0046-49 [CALCRIM Nos. 1000, 1015.)

The jury was further instructed that in order to find Terrell guilty of assault with intent to commit rape or oral copulation, it had to conclude he had the specific intent to rape or orally copulate the victim when he assaulted her, and that intent could be proven by circumstantial evidence. (*Id.* at 0058-59, 0062 [CALCRIM Nos. 223, 225, 252.)

Terrell contends the evidence was insufficient to establish that he harbored an intent to rape or orally copulate the victim, Emily. (Mem. of Points and Authorities in Supp. of Pet., ECF No. 1 at 10-23.) She testified that after changing into a pair of running shorts and emerging from the motel room bathroom, Terrell asked if Emily wanted to pose in her sports bra, and she declined. (Lodgment No. 2, vol. 2 at 57.) As the state court noted, the jury could have reasonably concluded Terrell's request was designed to have Emily wear revealing clothing. After Terrell surprised her by forcibly and without her consent zip tying her wrists, he dragged her over to the motel room bed. (*Id.* at 61-62.) Terrell then pushed her down onto the bed with her zip tied hands underneath her and hovered over her, pushing her shoulders down to immobilize her. (*Id.* at 63-64.) Terrell's act of dragging Emily to the bed, a common location for sexual

11

activities, hovering over her, and immobilizing her could lead a reasonable jury to conclude that he intended to forcibly sexually assault her. Emily also testified that during the period when Terrell was "hovering" over her, he was close enough to her face that she was able to bite him on the neck. (*Id.* at 64.) A reasonable jury could conclude Terrell's proximity to her and his position over her on the bed evidenced his intent to commit a sexual assault against her. After Emily bit Terrell, she was able to slide out from under him to the floor and get to her knees. (*Id.* at 66.) Terrell followed her to the floor and attempted to push her against the bed. (*Id.* at 66-67.) When she attempted to move toward the motel room door on her knees, Terrell again tried to push her back toward the bed, which a reasonable jury could have concluded was further evidence of his intent to sexually assault her. (*Id.* at 67.) Indeed, she testified she thought Terrell was going to rape her. (*Id.* at 68.)

Once police arrived, they searched the motel room and Terrell's backpack. (*Id.* at 114-16.) Police Officer Alonso Devalasco and Community Service Officer Sheldon Berg discovered the following items: the zip tie used on Emily, a bag of zip ties, a duct tape-covered zip tie, several pairs of women's running shorts which either lacked an interior panty liner or with the liner cut out, several clothes pins, a belt with a belt buckle, a piece of an electrical cord, and a roll of duct tape. (*Id.* at 116-34.) Devalasco testified the duct tape-covered zip tie appeared to be a "ball gag" which, in his experience, was used by people while engaging in sexual fantasies. (*Id.* at 121-22.) As the state appellate court noted, the jury could reasonably conclude Terrell removed the panty liners from the shorts in order to make it easier to access Emily's genitalia. And, given that Terrell had zip ties that he used to restrain Emily, the jury could reasonably conclude Terrell intended to use the belt, electrical cord, and duct tape to further restrain her.[2]

---

[2] The prosecutor argued during closing argument that Terrell intended to use the clothes pins as "nipple clamps" or "genital clamps." (Lodgment No. 2, vol. 3 at 273.) No evidence was presented to support this contention, and it is not clear to the Court that it would be within a jury's common knowledge that clothes pins could be used in this manner absent expert testimony. Accordingly, the Court does not consider this as evidence supporting Terrell's conviction.

Terrell argues the state court of appeal's opinion was based on an unreasonable determination of the facts. (Pet., ECF No. 1-1 at 18-23.) First, he contends the evidence does not support the court of appeal's conclusion that Terrell removed the liners in the athletic shorts Emily was to model and that even if Terrell had removed the liners it was unreasonable to conclude he did so to facilitate access to her genitals. (*Id.* at 19-20.) Devalasco testified two of the pairs of shorts Terrell had in the motel room had liners that appeared to have been cut out because "it [was] not a very clean cut . . . [and] [a]ny type of hemming would have been – would not have been – professional hemming would [not] have been done that way." (Lodgment No. 2, vol. 2, ECF No. 6-5 at 130-31.) In addition, he testified that nine other pairs of athletic shorts were found in the motel room. Of those, three had panty liners and the rest either did not have them or they had been removed. (*Id.* at 133.) Further, during a search of Terrell's bedroom, several panty liners that had been cut out were located in a bag underneath Terrell's bed. (*Id.* at 160.) While it is undoubtedly true that, as Terrell argues, the purpose of the liners is to "prevent chafing" and provide "privacy," that does not preclude the court of appeal's reasonable conclusion that removing the liners also made it easier to access Emily's genitals.

Second, Terrell contends the court of appeal unreasonably found that the duct tape-covered zip tie was a ball gag which indicated Terrell's intent to sexually assault Emily. (Pet., ECF No. 1-1 at 20.) Devalasco testified that as part of his experience in police work, he was familiar with the type of work the performed by the Vice Squad. (Lodgment No. 2, vol. 2, ECF No. 6-5 at 121.) That work included police "sting" operations involving prostitution in which clients of prostitutes engage in sexual fantasies, sometimes involving various devices. (*Id.* at 121-22.) One of those devices is a "ball gag," which is "a device placed over your mouth so you are not able to scream or – you know, yell." (*Id*. at 122.) Devalasco testified that, with regard to the duct tape-covered zip tie, "[t]he way it's fashioned here, it looks like it's kind of bigger at one end, which would probably be strapped deep into the mouth so the person cannot create any type of noise or emit any type of screams or something like that." (*Id*.) Devalasco

further testified that he "assumed this as being a tool that was used for some type of sexual gratification." (*Id.*) This testimony supports the court of appeal's determination that the duct tape-covered zip tie was a ball gag and that its presence supported the jury's conclusion that Terrell had the intent to rape or orally copulate Emily when he attacked her.

Finally, Terrell contends the court of appeal wrongly asserted the evidence at trial established that he "climbed on top of" Emily during the assault which was evidence of his intent to rape or orally copulate her. (Pet., ECF No. 1 at 20.) As noted, on direct examination, Emily testified she was lying on her back on the bed with her zip tied wrists beneath her while Terrell was above her pushing her shoulders down. (*Id.* at 63.) Terrell was "hovering over [her]," but she was not sure whether he was "fully on the bed or if he's just, you know, at the edge of it and pushing me down onto it, but he's holding my shoulders down." (*Id.* at 63-64.) She also testified that she was being "pinned down" by Terrell and that his face and neck were no more than six inches from her face. (*Id.* at 64-65.) On re-direct examination, the following exchange took place:

> [THE PROSECUTOR]: The entire time he's – he – essentially the grabbing is he moves you from one area in the room and throws you on the bed; correct?
>
> [EMILY]: Yes, I think he was preoccupied with that.
>
> Q. And then *he gets on top of you* and he's within six inches of your face; right?
>
> A: *Yes*.

(*Id.* at 106.)

On re-cross examination, Emily testified that while she was on the bed, Terrell was "[u]sing his body weight to keep me down." (*Id.* at 108.) This evidence is sufficient to support the court of appeal's assertion that Terrell climbed on top of her after zip tying her wrists behind her and shoving her onto the bed. But even if this fact is not considered, there is still overwhelming evidence to support the verdict.

14

17cv0088 BTM (AGS)

Given the above, there clearly was sufficient evidence to support the jury's conclusion that Terrell had the intent to rape or orally copulate Emily when he assaulted her, and therefore the state court's denial of Terrell's sufficiency of the evidence claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Terrell is not entitled to federal habeas corpus relief.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** the petition. Rule 11 of the Rules Following 28 U.S.C. § 2254 requires the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254 (West Supp. 2013). A certificate of appealability will issue when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253; *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005). A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002), quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Here, the Court concludes Terrell has not made the required showing, and therefore a certificate of appealability is hereby **DENIED**.

IT IS SO ORDERED.

DATED: _10/26/18_

_____
Barry Ted Moskowitz
Chief Judge, United States District Court